

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LISA YOUNG, )
)
           Plaintiff, )   Case. No. 07 C 2847
    v. )
)   Magistrate Judge
MICHAEL J. ASTRUE, Commissioner )   Arlander Keys
of Social Security, )
)
           Defendant. )

## MEMORANDUM OPINION AND ORDER

On December 4, 2003, Lisa Young filed an application for

Disability Insurance Benefits ("DIB"), claiming that she was

unable to work because of lifelong emotional disabilities and an

inability to cope with people or situations. R. 86. The

application was denied in February 2004, and again upon

reconsideration in August 2004. R. 29-30. In October 2004, Ms.

Young requested a hearing before an Administrative Law Judge

(ALJ). R. 45. Ms. Young appeared and testified before ALJ Dennis

R. Green on May 16, 2006. R. 309-402. The ALJ found that Ms.

Young was not disabled through December 31, 2005, her date last

insured, and that she was, therefore, ineligible for DIB. R. 28.

The Appeals council denied Ms. Young's request for review in May

2007, making the ALJ's decision the final decision of the Social

Security Commissioner. R. 5. Ms. Young filed the present action

in February 2008. She now asks the Court to enter summary

judgment in her favor, remanding the matter to the Commissioner

for further proceedings. The Commissioner has filed a cross-

motion for summary judgment, asking the Court to affirm his decision to deny benefits.

## Factual Background

A.    Ms. Young's Testimony

At the May 2006 hearing, Ms. Young testified that she was 34 years old and had a ninth-grade education. R. 315. She had no job, and lived with her husband and her mother. R. 316. Ms. Young testified that she could not work because she is emotional, has "trouble dealing with things," is irritable, and experiences extreme mental fatigue. R. 333-34, 344. Ms. Young initially alleged a disability onset date in 2000. R. 26, 159. But, because her previous application for DIB was denied in January 2003, this time around Ms. Young claims an onset date of February 2003. See R. 26, 159.

Ms. Young testified that her most recent work occurred in 2005, when the State of Illinois paid her to drive her autistic half-brother to various locations. R. 316-17. She performed that work for a total of thirty to forty hours. R. 316-17. Besides this, Ms. Young had been unemployed since January 2001. R. 95, 319.

Ms. Young testified, and the record confirms, that she worked nearly continuously between February 2000 and January 2001. R. 95-99. She held three jobs during this period, and her earnings totaled more than $18,000. R. 325. Between February and

November 2000, she worked answering phones and taking orders for flowers. R. 95, 319. In November, she worked as a receptionist, but that job lasted only about three weeks. R. 73-75, 95. From December 2000 to January 2001 she sold flowers for a flower wholesaler, but that job also lasted only three weeks. R. 73-75, 95, 319. Before this period of employment, Ms. Young had worked as a flower arranger, a job for which she had attended school. R. 319-20.

Ms. Young testified that she held seventeen jobs between 1991 and the date of the hearing. R. 327. Most were short-term jobs lasting only a few weeks or months. R. 381. She held her longest job in the early 1990s; the job (cashier) lasted approximately two years and required her to work about thirty hours per week. R. 327-28. Ms. Young also held a clerical job for approximately a year and a half "later on in the late 90's." R. 329. Ms. Young testified that she left the clerical job because she found a job at a floral arts school, where she preferred the less stressful, more solitary work environment. R. 329. After working at the school for approximately a year, she left because she felt the neighborhood was unsafe. R. 330. She later returned to work at the school, but left once again after an argument with her boss. R. 331.

Ms. Young testified that she typically awakes between 2:30 and 5:00 in morning, makes her husband coffee, and packs his

3

lunch. R. 337. She then proceeds to "peck away at things,"
sporadically working in the garden and doing laundry and other
housework; she testified that she does "a little here and then
I'll go back to it when I can . . . .". R. 337. She also
testified that she does absolutely nothing two or three days each
week. R. 347. She prefers to do her shopping online, and rarely
goes to a store for anything other than groceries. R. 344. When
she does go to the store, she is easily aggravated or irritated.
R. 345. She has no friends, and socializes only with her husband,
mother, father, stepmother, and brother. R. 345.

Ms. Young testified that she once used alcohol regularly and
was a "violent drunk," but she quit using alcohol in 2001 when
she started taking Zoloft. R. 334, 346. She also testified that
she had used cocaine, acid, and pot, but that she had done no
drugs since 1990. R. 335. Ms. Young claimed that she underwent
some sort of drug counseling, but could not remember any details.
R. 348. The ALJ requested that she provide evidence supporting
her claim that she no longer used drugs and alcohol —
specifically a record of the drug counseling — but she was unable
to provide such proof. R. 158, 349.

Ms. Young testified that her medication helps her deal with
her condition. R. 365. She testified that she stopped taking her
medication a number of times, usually because she thinks she no
longer needs it and does not want to continue paying for it. R.

4

365, 373. She testified, however, that, whenever she stops her medication, "everything just falls apart," and she realizes that she does need it. R. 374. Ms. Young testified that she had tried various medications, including Zoloft, Topamax, Zyprexa, Neurontin, Clonazepam, and Lithium. R. 336, 342, 373. She indicated that she found Topamax, which the ME noted is good for bipolar disorder, especially helpful. R. 373.

B.    Record Medical Evidence

The record shows that Ms. Young has a long history of psychiatric treatment. She first received treatment in 1983, at the age of eleven. R. 169-171. She was diagnosed with Dysthmic Disorder, Oppositional Disorder, and Overanxious Disorder, and was hospitalized for over four months. R. 169-176. She spent another three months in the hospital in 1986, and a physician there diagnosed her with Major Depression, Conduct Disorder, Dysthmic Disorder, Identity Disorder, Borderline Personality Disorder, and various substance abuse problems. R. 176-79. After her discharge, she entered a treatment center where she lived, received therapy, and attended school for nearly two years. R. 482-505. The record does not show any psychiatric treatment between 1989 and 2000.

In September and October 2000, Ms. Young visited Elmhurst Memorial Guidance Services for treatment and counseling. R. 403-14. A psychiatrist there diagnosed her with Generalized Anxiety

Disorder and prescribed Xanax and Zoloft. R. 403. The psychiatrist and a therapist also signed a letter recommending that Ms. Young "be allowed a few days off of work in order to provide herself with time to deescalate and strengthen herself to be able to better cope with her identified stressors." R. 188. Ms. Young soon lost her health insurance coverage and discontinued treatment at Elmhurst Memorial. R. 403-05.

Between January 2001 and July 2003, Ms. Young visited DuPage County Health Department almost monthly for treatment. R. 189-242. In June 2001, a psychiatrist at DuPage diagnosed her with Anxiety Disorder, History of Polysubstance Dependence, and Personality Disorder with Borderline and Schizoid Features. R. 196. In 2002, staff psychiatrist Eyob Tessema diagnosed her with Bipolar Disorder. R. 220. During her sessions with Dr. Tessema and other staff psychiatrists, Ms. Young reported varying levels of anxiety, depression, worrying, and irritability. R. 189-242. She repeatedly affirmed that Zoloft helped her symptoms and decreased her anxiety. R. 189, 196, 202, 240. She also reported that she had quit her previous job as a receptionist because she "found it too boring." R. 192. She claimed that "she tends to leave her jobs because she gets bored and wants something new." R. 192.

Between July and October 2002, Dr. Tessema evaluated Ms. Young's mental status approximately monthly. R. 535-38. His notes

show little change in Ms. Young's mental status during that time: she was generally alert and oriented with no distress; her mood was good (although her affect was dysphoric); and her insight and judgment were fair. R. 535-38.

Less than a month after the October mental status report, which contained fairly benign findings, Dr. Tessema completed a Residual Functional Capacity (RFC) assessment for Ms. Young's previous DIB application. R. 547-551. He wrote that Ms. Young continued to have poor concentration, flight of ideas, poor impulse control, and angry outbursts. R. 550. He found that she was markedly limited in her ability to perform various work-related tasks, including the abilities to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) sustain an ordinary routine without special supervision, (4) work in coordination with or proximity to others without being distracted, (5) make simple work-related decisions, (6) complete a normal workday and work week without interruptions from psychologically based symptoms, (7) interact appropriately with the general public, (8) accept instructions and respond appropriately to criticism from supervisors, and (9) get along with coworkers without distracting them or exhibiting behavioral extremes. R. 547-49.

In late 2001 and early 2002, two state agency psychologists reviewed Ms. Young's medical records. R. 437-54, 463-80. Both

found that she suffered from Anxiety Disorder and had a history of substance abuse. R. 437, 467. One of the psychologists also diagnosed a personality disorder. R. 444. Both psychologists concluded that Ms. Young's medical condition caused her no more than moderate functional limitations, and one noted that she had shown improvement with medication. R. 451-53, 463-65, 477.

In 2004, two different state agency psychologists reviewed Ms. Young's medical records. R. 247-60. They recognized that she suffered from Bipolar Disorder and had a history of substance abuse. R. 247-56. However, they found that she experienced only mild or moderate limitations from her impairments, and they concluded that her impairments did not meet or equal a listed impairment. R. 247, 257. The psychologists also assessed Ms. Young's RFC, and found her to be "mentally capable of performing simple repetitive tasks with limited contact with the general public," and "not significantly limited in [her] ability to understand, remember and carry out simple instructions." R. 261-63.

Also in 2004, a psychiatrist at DuPage Mental Health Services conducted a psychiatric evaluation of Ms. Young for the Bureau of Disability Determination Services (DDS). R. 243-245. The psychiatrist concluded that Ms. Young was depressed, but alert and oriented. R. 245. He diagnosed her with Bipolar Disorder. R. 245.

8

In December 2003, Ms. Young first visited Dr. Pravin Bhatt. R. 266. She visited Dr. Bhatt four times during 2004 and three times during 2005. R. 296-304. In early 2004, Dr. Bhatt prepared a psychiatric report for DDS, in which he diagnosed Ms. Young with Bipolar disorder. R. 266. He prepared another statement on her mental impairments in late May 2006, after the hearing with the ALJ. R. 161-66. In this statement, Dr. Bhatt opined that Ms. Young would be incapable of even low-stress jobs, and that her symptoms would constantly interfere with the attention and concentration necessary to perform even simple work tasks. R. 162. He indicated that her impairments caused marked difficulties in social functioning and extreme deficiencies of concentration, persistence, or pace. R. 163. Dr. Bhatt estimated that, if Ms. Young were employed, her impairments would cause her to miss work more than three days per month. R. 163. He also estimated that she would need to take 20-30 minute breaks more than three times a day. R. 163. Dr. Bhatt indicated that Ms. Young would be "unable to meet competitive standards" for a variety of work tasks, including maintaining regular attendance, sustaining an ordinary routine without special supervision, and working in coordination with or proximity to others. R. 165-66. Ms. Young gave Dr. Bhatt's report to the ALJ after the hearing. R. 161.

In January 2006, psychologist Terrance McGovern examined Ms. Young, administered the Minnesota Multiphasic Personality

Inventory-2 (MMPI) test, prepared a mental status report, and
issued a psychological evaluation. R. 283. According to Dr.
McGovern's mental status report, Ms. Young was well-oriented to
person, place, and time; her memory functioning was intact,
though she had some minor problems with attention and
concentration; her ability to perform simple arithmetic
calculations was intact; her abstract reasoning for known
proverbs was within normal limits; and her judgment for simple
demand tasks was intact. R. 287. The MMPI, however, revealed
"numerous psychological concerns," and Dr. McGovern believed "her
results are consistent with her diagnoses of a bipolar disorder,
anxiety, and borderline personality disorder." R. 287. Dr.
McGovern also stated that Ms. Young likely suffers from clinical
depression. R. 287.

Dr. McGovern's report shows that Ms. Young's score on the
MMPI's "infrequency" scale was significantly elevated. R. 285.
The infrequency scale is a validity scale. R. 285. An elevated
score indicates that the examinee perceives herself as having
numerous severe emotional problems, and suggests that the test
results may be influenced by that perception. R. 285. Ms. Young
also had elevated scores on the Depression scale (which measures
the examinee's degree of symptomatic depression), the
Psychopathic Deviate scale (which measures the examinee's belief
that social and moral standards do not apply to her), the

10

Paranoia scale (which measures the examinee's level of suspicion regarding the motives of other people), the Psycasthenia scale (which measures the presence of obsessive worries and exaggerated fears), and the Schizophrenia scale (which measures the examinee's experience of Schizophrenic symptoms). R. 286. Ms. Young's score on the Social Introversion scale was only marginally elevated, indicating that she is introverted and tends to avoid the company of others. R. 286.

In his report, Dr. McGovern also noted that he observed Ms. Young's moods change swiftly during the assessment, and he stated that this "would raise some questions about her ability to function in many work settings." R. 287. He assessed Ms. Young as being "quite distraught and overwhelmed with her current life circumstances." R. 287. Dr. McGovern then completed a statement of Ms. Young's ability to do mental work-related activities. R. 277. He concluded that Ms. Young had marked limitations in her ability to respond appropriately to work pressures and interact appropriately with supervisors and co-workers. R. 278.

C.    Medical Expert Testimony

At the hearing on May 16, 2006, the ALJ heard testimony from two other witnesses besides Ms. Young. First, the ALJ heard from Dr. Kathleen O'Brien, a licensed clinical psychologist, who testified as a Medical Expert ("ME"). R. 351. ME O'Brien testified that, prior to the hearing, she had reviewed all of the

11

"Exhibit B" medical records, including the evaluation from Dr. McGovern, most of the notes and mental status examinations from the treatment providers at DuPage County Health Department and Elmhurst Memorial Guidance Services, the reports from the various state agency psychologists, and most documents related to Ms. Young's childhood psychiatric treatment. See R. 2-4, 356. During the hearing, the ME received and reviewed additional medical evidence, including Dr. Bhatt's treatment notes, Dr. Tessema's 2002 RFC assessment, and some other evidence related to Ms. Young's treatment before 2002. R. 357. The ME did not see Dr. Bhatt's May 2006 report, because Ms. Young did not submit it until after the hearing. R. 161.

The ME testified that, in her opinion, Ms. Young's medical records contained several significant conflicts or deficiencies. R. 351. First, the ME addressed Dr. McGovern's psychological evaluation. R. 351. She stated that the 2006 evaluation was the first document to indicate that Ms. Young's ability to interact socially was markedly impaired (at this point the ME had not yet seen Dr. Tessema's 2002 report, which contained the same conclusion). R. 352-53. The ME noted that Dr. McGovern's conclusion was based only on Ms. Young's self-report, and that Ms. Young's medical records prior to that evaluation revealed only "social interactional difficulty," and no marked impairments. R. 351-53. She also noted that Dr. McGovern

12

otherwise found Ms. Young well-oriented and able to concentrate and solve simple tasks and problems. R. 352-53.

The ME then stated that the MMPI test that Dr. McGovern administered yielded elevated validity scores, indicating that during the test Ms. Young responded in a way that may have exaggerated her symptoms. R. 353. Even so, the ME noted that Ms. Young's score on the social introversion scale was only marginally elevated. R. 353. The ME testified that this score contradicted Ms. Young's claim of a marked impairment in social interaction. R. 353.

Next, the ME identified inconsistencies between Ms. Young's alleged symptoms and her actual medical treatment. R. 354-55. She testified that Ms. Young's disorders all have specific kinds of cognitive emotional treatments (i.e. counseling), and opined that if the symptoms were as severe as Ms. Young claimed, a treatment provider would have tried some of those treatments. R. 354. The ME found no record of such counseling; she characterized Ms. Young's treatment history since 2001 as consisting of "basically a medication check no more often than once every three months and sometimes as long as six months." R. 354. Without such therapy, the ME indicated that treatment providers' opinions about Ms. Young's social interaction impairments would necessarily be based on Ms. Young's self-report. R. 364.

13

The ME also noted that Ms. Young's treatment providers had made few efforts to alter her medications. R. 354. The ME stated that dozens of medications exist for treating Ms. Young's disorders, and she opined that, if Ms. Young's symptoms were as severe as she claimed, her treatment providers would have tried more new medications in an effort to relieve those symptoms. R. 354. The ME testified that Ms. Young had tried only a "handful" of the available medications. R. 354.

In response to questioning by Ms. Young's attorney, the ME conceded that people with limited financial resources may not always get the best treatment (although she noted that even people with sufficient financial resources may receive poor medical treatment). R. 365. Ms. Young interjected that her husband's insurance did not cover counseling, and that her husband and mother's income prevented her from qualifying for free therapy. R. 355-56.

The ME then testified that the treatment notes from DuPage County Health Department show that Ms. Young's "mental status is always considered to be pretty okay," despite reports of anxiety and occasional panic attacks. R. 354. She also noted that the 2004 psychiatric report by state agency psychologists found that Ms. Young's impairments were not of listing severity. R. 355. The ME testified that nothing in the record indicated that Ms.

14

Young's condition had deteriorated significantly in the two years since that report. R. 355.

Finally, after being supplied with Dr. Tessema's 2002 RFC, the ME identified contradictions regarding that document. R. 357-60. The ME noted that on October 14, 2002, Dr. Tessema indicated that Ms. Young's mental status was essentially "fine." R. 358. Yet less than one month later, Dr. Tessema completed an RFC which stated that Ms. Young "continues to have poor concentration, flight of ideas, poor impulse control and angry outbursts." R. 358. The RFC also indicated that Ms. Young had marked limitations in a variety of work related areas. R. 547-49. The ME characterized the discrepancy between the October mental status report and the November RFC as "a contradiction that I can't do anything with." R. 359. In response to Ms. Young's attorney's question about whether such variations in Ms. Young's condition were consistent with bipolar disorder, the ME said "the only time that it seems to be marked is when [Ms. Young] goes in for a certain kind of evaluation but when I look at the day to day records of the treatment . . . that's where they say everything is fine. I don't know what to do with that." R. 360. The ME concluded that, even if the ALJ gave full credit to Dr. McGovern's report (which indicated that Ms. Young had a marked impairment in social interaction), Ms. Young's impairments still would not meet a listing. R. 374-75.

15

D. Vocational Expert's testimony

After the ME testified, the ALJ called Vocational Expert (VE) Thomas Dunleavy to testify. R. 377. The VE asked Ms. Young a few questions about her previous jobs, and testified that he had reviewed her work history. R. 377-81. He testified that he would classify Ms. Young's previous jobs as "light-unskilled" and "medium-semiskilled." R. 377-81.

The ALJ then asked the VE to identify jobs available to a hypothetical person of Ms. Young's age, education, and work history, who was capable of performing simple, repetitive tasks with limited contact with the general public. R. 382. The VE testified that such a person could perform jobs in packaging, assembly, office cleaning, and other light-unskilled areas. R. 382. He stated that at least 40,000 to 50,000 such jobs existed in the Chicago metropolitan area. R. 382-84. The ALJ also asked the VE to consider Ms. Young's employability "if I were to find the claimant's testimony fully credible." R. 384. The VE testified that, if Ms. Young's testimony about her difficulty working with other people were true, "she would have a very difficult time sustaining employment" even in the occupations mentioned above. R. 384.

During examination by Ms. Young's attorney, the VE testified that any person who missed more than one day of work per month would have trouble sustaining a job. R. 387. He testified that a

person who missed one or more days per week would likely be unemployable. R. 387.

## The ALJ's Decision

An ALJ employs a five-step test to determine whether a claimant is disabled under the Social Security Act: (1) whether the claimant currently engages in substantial gainful activity; (2) whether the claimant has a medically determinable impairment that is "severe"; (3) whether the impairment meets or medically equals the criteria of a listed impairment; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work in the national economy. See 20 C.F.R. § 404.1520 (2008). In order to decide steps four and five, an ALJ must first determine the claimant's residual functional capacity (RFC) for performing work activities. Id.

Here, the ALJ determined that Ms. Young prevailed on steps one and two. R. 24-5. He found that she did not engage in substantial gainful activity during any time relevant to the decision, and that her bipolar disorder, anxiety, borderline personality, and history of drug and alcohol abuse constituted severe impairments. R. 24-5.

The ALJ concluded, however, that Ms. Young's combination of impairments did not meet or equal a listed impairment, and that,

17

therefore, her claim failed at step three. R. 25. In making this determination, the ALJ considered the ME's testimony, Dr. Bhatt's opinion, the opinions of the state agency psychologists, the test scores and mental status exam performed by Dr. McGovern, and Ms. Young's own description of her impairments. R. 25. The ALJ declined to adopt Dr. Bhatt's opinion that Ms. Young's bipolar disorder was of listing-level severity, and instead relied upon the evidence indicating that her impairment did not meet or equal a listing. R. 25.

The ALJ then evaluated Ms. Young's RFC. He found that she could perform unskilled work consisting of simple, repetitive tasks, with no exertional limitations and limited contact with the general public. R. 25. In making this determination, the ALJ considered Ms. Young's symptoms and opinion evidence. R. 26. He found that, while her medically determinable impairments could reasonably be expected to produce her claimed symptoms, her "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." R. 26. The ALJ cited numerous reasons for doubting Ms. Young's credibility about the severity of her symptoms: the ME's testimony about the contradictory evidence, the inconsistencies in Dr. McGovern's report, the inconsistency between the medical treatment Ms. Young received and the alleged severity of her symptoms, and Ms. Young's history of drug and alcohol abuse. R. 26. The ALJ found

that Ms. Young's credibility was further tarnished by her
performance of work activities after her first alleged disability
onset date (2001), her regular performance of a full range of
daily activities, and the improvement in her condition after
quitting alcohol and beginning to take Zoloft. R. 26. Still,
based on Ms. Young's RFC and the testimony of the VE, the ALJ
found that Ms. Young could no longer perform her past relevant
work, and thus she prevailed on step four of the inquiry. R. 27.

At step five, however, the ALJ concluded that, based on her
age, experience, and RFC, Ms. Young could perform other work in
the national economy. R. 27. In reaching this conclusion, the ALJ
relied on the VE's opinion that a person with Ms. Young's
limitations could perform jobs in assembly, packaging, office
cleaning, and other light unskilled areas, and on the VE's
testimony that between 40,000 and 50,000 such jobs existed in the
Chicago metropolitan area alone. R. 27. The ALJ also stated that,
pursuant to SSR 00-4p (2000), the VE's testimony was consistent
with the information contained in the DOT. R. 27.

Having determined that Ms. Young's impairments did not meet
or equal a listed impairment, and that she had the RFC to perform
jobs existing in significant numbers in the national economy, the
ALJ concluded that Ms. Young was not under a "disability" as
defined in the Social Security Act. R. 28. He therefore denied
her request for benefits. R. 28.

Ms. Young sought review of the decision, but the Appeals Council denied her request and adopted the ALJ's decision as the agency's final decision. R. 5-8. Ms. Young then filed suit in this Court and moved for summary judgment, seeking remand of her case based on alleged errors in the ALJ's decision.

Specifically, Ms. Young argues that the ALJ's decision was wrong for four reasons. First, she contends that the ALJ erred at step three of the inquiry by finding that her impairments did not meet or equal a listing. Specifically, she argues that the ALJ (1) improperly rejected Dr. Bhatt's opinion in favor of opinions from non-examining psychologists; (2) failed to provide a sufficient explanation for rejecting Dr. Bhatt's opinion; and (3) improperly relied on medical opinions that were based on factual errors or mischaracterizations. Second, Ms. Young argues that the ALJ's RFC determination was faulty because it ignored evidence of two of her impairments. She further argues that, because the VE relied on the faulty RFC, his testimony could not constitute substantial evidence supporting the ALJ's decision. Third, Ms. Young contends that the ALJ should not have considered her past drug and alcohol abuse when evaluating her credibility. And fourth, Ms. Young argues that the ALJ erred by failing to affirmatively establish the absence of conflict between the VE's testimony and the information contained in the DOT.

## Discussion

The Agency's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g) (2006). "[T]he standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The reviewing court may not decide the facts differently, reweigh the evidence, or substitute its judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for making the determination lies with the Agency, not the courts. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

Of course, in order for a court to conduct a meaningful review, the ALJ must, at minimum, "articulate reasons for accepting or rejecting entire lines of evidence." *Herron*, 19 F.3d at 333. While an ALJ need not provide a written evaluation of every piece of evidence, he must consider all relevant evidence when reaching his decision, and he must "articulate at some minimal level his analysis of the evidence." *Id.* (quoting *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)). The ALJ's assessment of the evidence must be detailed enough to (1) assure the

reviewing court that he considered all important evidence, and (2) allow the court to trace the path of his reasoning. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

A.   The ALJ's conclusion on step three

A claimant is disabled if her impairment or combination of impairments meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ determined that Ms. Young's impairments did not meet or equal a listed impairment. R. 25. Dr. Bhatt, Ms. Young's treating psychiatrist, opined that Ms. Young's impairment was severe enough to meet or equal the criteria for Listing 12.04, Bipolar Disorder. R. 25, 161-66; *see* 20 C.F.R. § 404, Subpt. P, App. 1. Ms. Young contends that the ALJ erred by (1) rejecting Dr. Bhatt's opinion in favor of opinions of non-examining psychologists; (2) failing to provide a sufficient explanation for rejecting Dr. Bhatt's opinion; and (3) relying on factual errors or mischaracterizations in the ME's testimony.

An ALJ should give controlling weight to the opinion of a treating source when the source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (2006). An ALJ may not reject the opinion of a treating source based only on the contradictory opinion of a non-examining source. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.

2003). In *Gudgel*, an ALJ rejected the opinions of two examining physicians in favor of the contradictory opinion of one non-examining source. *Id.* at 468-70. The Seventh Circuit remanded, holding that the "contradictory opinion of a non-examining physician does not, by itself, suffice" as a basis for rejecting the opinions of examining sources. *Id.* at 470.

Here, however, the ALJ did not reject Dr. Bhatt's opinion solely in favor of one non-examining source. Rather, he rejected Dr. Bhatt's opinion based on the combined weight of the ME's testimony, the opinions of multiple state agency psychologists, the test scores and mental status exam from examining psychologist Dr. McGovern, evidence related to Ms. Young's daily activities, and Ms. Young's own testimony. R. 25-6. Thus, substantial evidence supported the ALJ's finding that Ms. Young's impairments did not meet or equal a listing. *See Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (holding that an ALJ was justified in giving less weight to one examining physician's opinion based on the contrary opinions of several other examining and non-examining sources).

Ms. Young also contends that the ALJ failed to explain why he rejected Dr. Bhatt's opinion. She argues that this failure makes it impossible for a reviewing court to determine whether substantial evidence supports the decision. Agency regulations state that the ALJ "will always give good reasons in our notice

of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). However, this Court reviews the ALJ's judgment, not his opinion. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.* An ALJ who rejects uncontradicted medical evidence, of course, must provide a much more detailed explanation. *Id.*

Here, the ALJ accurately summarized Dr. Bhatt's opinion and stated that it did not deserve controlling weight, given the abundance of contradictory evidence. R. 25-6. The ALJ adequately discussed the contradictory evidence: the ME's testimony, the opinions of multiple state agency psychologists, the test scores and mental status exam from examining psychologist Dr. McGovern, evidence regarding Ms. Young's daily activities, and Ms. Young's own testimony about her impairments. R. 25. This discussion evidences the ALJ's consideration of all important evidence, and allows this Court to understand why the ALJ rejected Dr. Bhatt's opinion – namely, because of the existence of substantial contrary evidence.

Ms. Young also argues that the ME mischaracterized her testimony, and that one of the state agency psychologists failed to review the entire medical record. Because of these

deficiencies, she argues, their opinions were inaccurate and the ALJ's reliance on their opinions is problematic.

With regard to the ME, Ms. Young first argues that she was wrong to describe her post-2001 treatment regimen as "a visit to a psychiatrist for basically a medication check no more often than once every three months and sometimes as long as six months." R. 354. In fact, she argues, the record actually shows almost monthly visits to DuPage County Health Department during some of that time period. Ms. Young also challenges the ME's statement that the record lacked much in the way of "evidence of attempts to change things on the basis of the medications," R. 354; in fact, she argues, the psychiatrists at DuPage, and later Dr. Bhatt, consistently adjusted her medications and dosages, and prescribed at least nine different medications. Citing *Hodes v. Apfel*, 61 F.Supp.2d 798 (N.D.Ill. 1999), Ms. Young argues that these mischaracterizations and mistakes in the ME's testimony make the ALJ's reliance on the ME's testimony improper.

An ME's opinion does not constitute substantial evidence where it is based on a material factual error that would cause a reasonable person to reject the opinion as inadequate to support the ALJ's final conclusion. *Hodes*, 61 F.Supp.2d at 808; *Lewis v. Astrue*, 518 F.Supp.2d 1031, 1044 (N.D.Ill 2007). In *Hodes*, the ALJ relied solely on one physician's opinion to conclude that the claimant was not disabled. 61 F.Supp.2d at 807. However, that

physician based his opinion on the belief that an examining doctor had seen the claimant walking without a cane; in fact, the examining doctor had seen the claimant walking *with* a cane. *Id.*

Here, the ME's statement about the frequency of Ms. Young's treatment was inaccurate with respect to the period between January 2001 and July 2003—the record indeed shows that Ms. Young visited DuPage County Health Department approximately monthly during that period. R. 202-42. However, the ME's statement accurately characterized the time period between July 2003 and the date of the hearing, when Ms. Young visited Dr. Bhatt only three or four times per year. R. 296-304. Unlike in *Hodes*, the ME's characterization here was not a glaring factual error; rather, the ME's characterization was accurate in part and inaccurate in part – and, importantly, the ME's statement accurately characterizes the majority of the time period that is relevant for present purposes. Thus, the ALJ's reliance on the ME's statement is perfectly acceptable. *See Lewis*, 518 F. Supp.2d at 1044 (distinguishing a medical opinion containing a minor factual inconsistency from one containing an error so unreasonable that no reasonable person could accept the opinion as adequate to support the ALJ's conclusion).

Moreover, the ALJ did not rely exclusively on the ME's testimony in finding Ms. Young not disabled, but also considered other evidence that supported the ME's opinion. *See Lewis*, 518

26

F.Supp.2d at 1044 (holding that an ALJ could rely on a medical opinion that contained a minor factual error where other evidence buttressed the opinion). In short, the ME's opinion was not inaccurate in any meaningful way, and the ALJ's reliance on it poses no problem.

Ms. Young also attempts to discredit the ME's testimony by identifying two additional "mischaracterizations." Ms. Young points out that the ME stated that she did not receive the type of counseling normally associated with her alleged impairments, and characterized her psychiatric visits as "medication checks" rather than counseling. R. 354. The ME also testified that she "didn't see a lot of evidence of attempts to change things on the basis of the medications." R. 354. Ms. Young disputes the ME's characterizations, arguing that, properly interpreted, the record medical evidence reveals that she received counseling appropriate for her impairments, and that her physicians made sufficient attempts to alter her medication and dosages.

Essentially, Ms. Young asks this Court to accept her characterizations of record medical evidence over those of the ME. But a reviewing court does not re-weigh evidence nor choose between competing interpretations of medical evidence. *See Herron*, 19 F.3d at 333. The reviewing court only determines whether the ALJ's decision is based on substantial evidence. 42 U.S.C. § 405(g). Here, the ME reviewed the entire record (with

27

the exception of certain notes from Dr. Bhatt that Ms. Young did not supply until after the hearing). R. 354. She considered the treatment notes from Ms. Young's various doctors, and opined that the notes did not evidence the type of counseling a person with Ms. Young's alleged symptoms would have received. R. 354. The same treatment notes also contained information regarding Ms. Young's various medications, and after reviewing that evidence, the ME characterized the quantity of those medications as only "a handful" given the "dozens" of drugs available. R. 354. While the ME characterized this evidence differently than Ms. Young would have, this Court is satisfied that her opinion constituted substantial evidence on which the ALJ was entitled to rely.

Ms. Young further argues that one state agency psychologist's failure to review the entire record makes his 2004 opinion an inappropriate basis for rejecting Dr. Bhatt's opinion. Ms. Young points out that the state agency psychologist formed his opinion without seeing Dr. Bhatt's treatment notes or Dr. McGovern's 2006 report. But at the time the psychologist issued his report (February 2004), Ms. Young had only been seeing Dr. Bhatt for a month and a half (during which time she visited him twice), and Dr. McGovern's report did not yet exist. R. 247-60, 283, 296-304. In fact, the record shows that the state agency psychologist reviewed extensive medical records detailing Ms. Young's treatment from her childhood through her February 2004

psychiatric evaluation at DuPage Mental Health Services. R. 259.
Given the substantial quantity of medical evidence that the state
agency psychologist considered, his "failure" (or inability) to
consider Dr. Bhatt's notes and Dr. McGovern's report would not
cause a reasonable person to reject his opinion as inadequate to
support the ALJ's decision. *See Hodes*, 61 F.Supp.2d at 808.
Therefore, in conjunction with other relevant evidence-the ME's
testimony, the opinions of other state agency psychologists, the
test scores and mental status exam from Dr. McGovern, evidence
about Ms. Young's daily activities, and Ms. Young's own
testimony-the state agency psychologist's 2004 opinion
constitutes substantial evidence on which the ALJ was entitled to
rely. *See Young*, 362 F.3d at 1001-02; *Lewis*, 518 F. Supp.2d at
1044.

Citing *Murphy v. Astrue*, 496 F.3d 630 (7th Cir. 2007), Ms.
Young next argues that the ALJ should have submitted Dr. Bhatt's
opinion to the ME for review and comment before rejecting it. In
*Murphy*, an ME testified that the claimant had suffered from a
marked impairment in an important functional area *before* the
alleged disability onset date. *Id.* at 632. Lack of evidence
prevented the ME from opining about whether the impairment
existed after the onset date. *Id.* After the hearing, the ALJ
received additional relevant evidence, evaluated it himself, and
decided that the claimant no longer suffered from the impairment.

*Id.* Essentially, the ALJ, without the benefit of any medical opinion whatsoever, decided that the claimant's previously existing impairment had disappeared as of the alleged onset date. *See id.* The Seventh Circuit remanded, holding that the ALJ should have submitted the post-hearing evidence to the ME for his opinion before concluding that a previously existing medical condition had simply disappeared. *Id.* at 635.

Here, the ALJ based his conclusion not on his own evaluation of raw evidence, but on his evaluation of expert medical opinions from the ME, Dr. Bhatt, and a variety of other sources. R. 25. The ME offered an opinion on whether Ms. Young met a listing, and she did so after reviewing the substantial quantity of record medical evidence. *See* R. 351-75. Unlike the ALJ in *Murphy*, the ALJ did not use post-hearing evidence to "fill gaps" in the ME's opinion. The ALJ simply gave greater weight to the ME's opinion than he did to Dr. Bhatt's late-arriving opinion. R. 25-6. Therefore, *Murphy* does not control, and the ALJ was not required to recall the ME so she could incorporate Dr. Bhatt's notes and opinions into her testimony.

B.   The ALJ's RFC determination

Ms. Young contends that the ALJ's RFC determination was flawed because it failed to account for her limited ability to (1) sustain a full-time work schedule, and (2) interact appropriately with coworkers and supervisors. She argues that,

because the RFC provides the basis for the VE to determine whether jobs exist that the claimant can perform, the ALJ's faulty RFC finding made the VE's testimony inaccurate and insufficient to support a finding of not disabled.

In making his RFC determination, an ALJ must consider the claimant's ability to sustain a full-time work schedule. *See* SSR 96-8p (1996); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). SSR 96-8p clarifies that RFC is the individual's "remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. In *Carradine*, the ALJ found that a claimant suffering from severe pain had a sufficient RFC to perform various work activities. *Carradine*, 360 F.3d at 755. The ALJ relied on evidence showing that the claimant regularly did housework, walked, drove, and shopped. *Id.* The Seventh Circuit reversed, holding that the ALJ erred by not considering the effect of the claimant's chronic pain on her ability to sustain a full-time work schedule. *Id.* The court distinguished the claimant's ability to engage in sporadic physical activities on her own schedule from "being able to work eight hours a day five consecutive days of the week." *Id.*

Here, the ALJ did not discuss Ms. Young's ability to maintain a full-time work schedule, and he should have; SSR 96-8p requires such a discussion. Record evidence, including Ms. Young's testimony, Dr. Bhatt's opinion, Dr. Tessema's 2002 RFC evaluation, and Ms. Young's history of short-term jobs suggest that Ms. Young might have difficulty sustaining full-time employment. R. 165, 337-47, 548. The VE signaled the importance of this issue when he testified that, if Ms. Young's limitations forced her to miss more than one day of work per month, she may have trouble keeping a job. R. 384.

Clearly, the ALJ did not find Ms. Young's account of her own limitations entirely credible. R. 26. And, given the contradictory evidence in the record, he found some evidence persuasive and some less so. R. 25-6. Perhaps the ALJ determined that the contradictory evidence and Ms. Young's lack of credibility negated the severity of her symptoms so much that her impairments did not prevent her from sustaining a full-time work schedule. But, because he failed to address the issue in his opinion, the Court cannot be sure that he considered it at all. The ALJ has thus failed to comply with SSR 96-8p, and has left this Court unable to determine whether the RFC reflects Ms. Young's capacity to perform work activities on a regular and continuing basis.

Ms. Young also faults the ALJ for failing to consider evidence of her limited ability to interact properly with supervisors and coworkers. Indeed, where substantial evidence indicates that a claimant has a particular functional limitation, the ALJ must explain his finding on that particular limitation in order to satisfy a reviewing court that substantial evidence supports the overall RFC finding. *See Young*, 362 F.3d at 1002. Here, evidence from three examining sources—Drs. McGovern, Bhatt, and Tessema—specifically states that Ms. Young is markedly limited in her ability to properly interact with supervisors and coworkers. R. 165, 275-77, 547-49. Only the opinions of the state agency psychologists explicitly disagree with this conclusion; the ME did not herself offer an opinion on whether Ms. Young suffered marked limitations in this area. *See* R. 247-63, 451-53, 463-65. Because the record could support a finding that Ms. Young did suffer such a functional limitation, the ALJ should have addressed the issue in his decision. *See Young*, 362 F.3d at 1002. Because he did not, this Court cannot meaningfully review his RFC finding. *See id.*

The ALJ's treatment of Dr. McGovern's opinion is especially troubling. The ALJ supported his RFC finding by highlighting Dr. McGovern's conclusion that Ms. Young had only minor problems with attention and concentration. R. 26. However, he ignored Dr. McGovern's conclusion—contained in the same report—that Ms. Young

was markedly limited in her ability to interact appropriately with supervisors and coworkers. *See* R. 278. The ALJ did note that Dr. McGovern's report seemed inconsistent, but he offered no explanation for why he accepted only the part of the report that was unfavorable to Ms. Young. Such selective discussion of medical evidence prevents this Court from determining the propriety of the ALJ's RFC finding. *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

This issue is no technicality. The VE testified that difficulty interacting with coworkers would seriously handicap Ms. Young's ability to sustain employment. R. 384. The ALJ's failure to properly consider this limitation could have altered the outcome of the case.

The resolution of this issue could also resolve Ms. Young's argument that the VE's testimony failed to take into account all of her limitations. When questioning the VE about jobs available to Ms. Young in the national economy, the ALJ based his hypothetical questions on an RFC that, as noted above, may not have included all of Ms. Young's limitations. *See* R. 382. The VE's testimony, based in turn on these deficient hypothetical questions, cannot constitute substantial evidence supporting a finding of not disabled. *See Young*, 362 F.3d at 1003-05. After revising his RFC finding pursuant to this opinion, the ALJ should question the VE about jobs available to Ms. Young considering *all*

of her limitations contained in the new finding. *See id.*; *Kasarky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2007).

C. The ALJ's credibility determination

Ms. Young next argues that the ALJ should not have used her history of substance abuse to discredit her testimony. A reviewing court typically affords great deference to an ALJ's credibility finding and will refuse to disturb it unless it is patently wrong. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). Still, the ALJ must adequately explain the reasons for his credibility finding, and provide more than a conclusory statement that the claimant's allegations are incredible. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003).

Here, the ALJ did not adequately explain why Ms. Young's history of substance abuse discredits her testimony. Ms. Young testified that she quit using drugs in 1990 and quit drinking in 2001. R. 334-346. Nothing in the record contradicted that testimony. Thus, the only relevant evidence indicates that, by the alleged disability onset date of February 2003, Ms. Young had been drug-free for about thirteen years and alcohol-free for about two years. R. 334-46. The ALJ's opinion fails to explain why Ms. Young's past indiscretions—some of them quite old—would affect her credibility about the severity of her symptoms after the alleged onset date.

Ms. Young's past substance abuse might call her credibility into question if she had been less than forthcoming about it, or if some evidence in the record contradicted her claim of sobriety. *See e.g. Bowen v. Astrue*, No. 1:06-cv-0903-DFH-TAB, WL 1455892 (S.D.Ind. 2007) (affirming an unfavorable credibility determination that was based on a claimant's past alcohol abuse where claimant had not been fully forthcoming about the abuse). But neither is true here. If the ALJ finds that Ms. Young's substance abuse, discontinued well before her onset date, discredits her testimony about the severity of her symptoms, he must explain why that is so. On remand, the ALJ should articulate the reasons why Ms. Young's past substance abuse discredits her testimony about her current symptoms. If he cannot, he should eliminate past substance abuse as a factor in his credibility finding, and adjust the weight given to Ms. Young's testimony accordingly.

Ms. Young also contends that the ALJ erred by not considering the effects of her medication on her credibility. SSR 96-7p explains that, when a claimant's statements about the intensity and persistence of her symptoms are not backed by objective medical evidence, an ALJ must consider certain factors in evaluating the credibility of the claimant's statements about her symptoms. One factor is the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken

to alleviate pain or other symptoms." SSR 96-7p (1996). When a
claimant is prescribed and regularly takes medication to treat
the symptoms she alleges, her statements about those symptoms are
deemed more credible. See id. If a claimant stops taking the
medication because it is ineffective or has negative side-
effects, her failure to take it does not detract from her
credibility about the severity of her symptoms. See id.

Here, the ALJ relied on the ME's testimony that "the methods
used to treat the claimant seemed inconsistent with the alleged
severity." R. 26. At the hearing, the ME had testified that,
among other things, Ms. Young's treatment providers' failure to
try more than "a handful" of the available medications conflicted
with Ms. Young's statements about the severity of her symptoms.
R. 354. Given the deference afforded to ALJ credibility
determinations, Indoranto, F.3d at 474, this Court is satisfied
that the ALJ properly considered Ms. Young's medication history
when evaluating her credibility. The ALJ was not required to
provide an in-depth discussion of each different type of
medication Ms. Young took, and how each reflected on her
credibility.

D.    Inconsistencies between the VE's testimony and the DOT

Finally, Ms. Young argues that the ALJ erred by failing to
ask the VE about inconsistencies between his testimony and the
information contained in the Department of Labor's Dictionary of

Occupational Titles (DOT). During his testimony, the VE had twice noted that his data regarding "office cleaner" positions did not match a category listed in the Department of Labor's Dictionary of Occupational Titles (DOT). R. 383, 385. He explained that the DOT incorporated office cleaner positions into the "housekeeper" category. R. 383, 385. In response to counsel's questions, the VE clarified that the DOT's "housekeeper" category included positions in hotel and motel cleaning as well as office cleaning, but since one of Ms. Young's limitations was inability to deal with the public, he had singled out the office cleaner position and extrapolated the available data to reach his conclusions about that position. R. 385.

SSR 00-4p states that "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." The responsibility for identifying such potential conflicts lies with the ALJ. See SSR 00-4p ("When a [VE] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [VE] evidence and information provided in the DOT").

Citing *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006),
Ms. Young argues that the ALJ failed to make the affirmative
inquiry required by SSR 00-4p, and thus did not meet his burden
of proof with regard to step five. In *Prochaska*, an ALJ relied
on a VE's testimony to conclude that jobs existed in the national
economy that the claimant could perform, but the ALJ did not ask
the VE whether his information conflicted with the DOT. *Id.* at
735-36. On appeal, the claimant identified potential
inconsistencies between the VE's testimony and the DOT; she
argued that the DOT listed more strenuous requirements for
certain jobs than the VE did, and that under the VE's definition
she was capable of performing some jobs but under the DOT
definition she was not. *Id.* The Seventh Circuit remanded,
holding that, although courts should "defer to an ALJ's decision
if it is supported by 'substantial evidence,'" no deference is
given when "there is an unresolved potential inconsistency in the
evidence that should have been resolved." *Id.* at 736.

Ms. Young, however, has, even now, failed to identify any
potential inconsistencies between the VE's testimony and the DOT.
The only inconsistency the Court can see is the one the VE
specifically identified and discussed. R. 383, 385. The fact
that the VE did so without prompting from the ALJ is immaterial.

*Conclusion*

For the reasons explained above, this Court finds that the ALJ's RFC determination does not pass muster. The ALJ, without explanation, excluded from his finding two functional limitations that may affect Ms. Young's ability to work. Because the VE's testimony rested on this deficient RFC finding, the VE's opinion cannot constitute substantial evidence showing that Ms. Young is capable of performing jobs that exist in the national economy. The Court is also unable to determine whether the ALJ's credibility determination is supported by substantial evidence. The ALJ discounted Ms. Young's credibility based upon her past drug and alcohol abuse, but he failed to explain why such past use would undermine her testimony about her current symptoms. Accordingly, the Court grants Ms. Young's motion for summary judgment and denies the Commissioner's motion. This matter is remanded for further proceedings consistent with this opinion.

Dated: July 23, 2008

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge